E. L. GAUDIN, and Margaret W. Gaudin, Plaintiffs,

v.

K. D. I. CORPORATION et al., Defendants.

No. C-1-75-173.

United States District Court, S. D. Ohio, W. D.

June 9, 1976.

Robert E. Manley, Cincinnati, Ohio, for plaintiffs.

Thomas S. Calder, of Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants K. D. I. Corp. and Walter G. Cox.

Ralph F. Mitchell, of Rendigs, Fry, Kiely & Dennis, and Douglas G. Cole, of Strauss, Troy & Ruehlmann Co. L.P.A., Cincinnati, Ohio, for defendants Charles F. Hartsock, and Cors, Hair & Hartsock.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court upon two motions, the motion of defendant KDI Corporation [1] (hereinafter KDI) for summary judgment, and the motion of defendants Cors, Hair and Hartsock and Charles F. Hartsock (hereinafter Hartsock) for summary judgment. The parties have submitted memoranda, affidavits and exhibits in support of their respective positions. These motions are made pursuant to Rule 56, Fed.R.Civ.P., and for the Court to grant such motions it must find "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

## INTRODUCTION

Plaintiffs seek to invoke this Court's jurisdiction pursuant to the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78a et seq., and particularly § 10(b) thereof, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5, and § 20(a) thereof, 15 U.S.C. § 78t(a), and related laws of the United States.

Both the United States Court of Appeals for the Sixth Circuit and the Supreme Court of the United States have recently considered the appropriate procedure with regard to questions of jurisdiction similar to those raised herein.

Common to this type of lawsuit is an alleged Rule 10b–5 claim which requires the court to explore the frontiers of statutory interpretation in order to ascertain whether federal question jurisdiction exists. Thus in dealing with the issues raised here we are not faced with the question whether the defendants' alleged wrongs call for a remedy, *but only whether plaintiffs should have access to the federal courts as well as the state courts to seek the remedy.* (emphasis added)

*Marsh v. Armada Corporation,* 533 F.2d 978 (6th Cir. 1976).

Failure to qualify under the *Birnbaum* rule is a matter that can normally be established by the defendant either on a motion to dismiss or on a motion for summary judgment.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 742, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975).

Three of the issues that have been raised will be considered by the Court: (1) Do the plaintiffs herein have standing under the *Birnbaum-Blue Chip* "purchase or sale" requirement? (2) Are plaintiffs barred by the statute of limitations applicable to federal securities violations? (3) Are plaintiffs' state law malpractice claims cognizable in federal court?

The first of these issues was raised in the motion of KDI. After adopting and agreeing to KDI's arguments as to the first issue and KDI's statement of the facts, the last two issues were raised in the motion of Hartsock and Cors, Hair and Hartsock.

### I. *Material Facts As To Which There Are No Genuine Issues*

A. The plaintiffs herein were the controlling stockholders of The Herbert Chemical Company (hereinafter Herbert) which sold substantially all of its assets to KDI for KDI stock pursuant to a Reorganization Agreement between KDI, Herbert, and the plaintiffs, dated July 31, 1969 (hereinafter Reorganization Agreement). The sale was closed on August 30, 1969. In connection with the sale to KDI, Herbert was dissolved

---

1. By a stipulation of counsel, defendant Walter G. Cox has joined as a movant in the motion for summary judgment filed by KDI.

and liquidated and the 136,368 shares of KDI stock that it received was distributed to its stockholders, including the plaintiffs herein, who received 87,191 shares.

B. The contract of sale included a guarantee protecting both plaintiffs against a drop in the value of the KDI stock below $22.00 per share and KDI against an increase in the value of the stock beyond $35.00, $40.00, or $50.00 per share, at different points in time. The guarantee was in three parts: (1) As to 23,647 of plaintiffs' shares, if the market value thereof as computed by a price formula in the agreement did not equal $22.00 per share six months from the date of closing, KDI would make up the deficiency by additional stock. If, however, the price exceeded $35.00 per share, the plaintiffs would return stock equal to the excess over $35.00 per share; (2) The second part of the guarantee was similar to the first, except that it became operative one year after the date of closing, and the operative return price was limited to the excess over $40.00 per share. This second part of the guarantee also attached to 23,647 of plaintiffs' shares; (3) The third part of the guarantee was similar to the other parts, except that it became operative two years after the date of closing, and the operative return price was limited to the excess over $50.00 per share, and it covered 47,294 of plaintiffs' shares.

KDI was obliged to deliver as many additional shares as necessary to satisfy any of the parts of the guarantee. The Reorganization Agreement initially required that 11,643 shares of KDI stock be held in escrow as security for the guarantee; this did not, however, limit the number of shares that might be owed under the guarantee.

C. On March 1, 1970, six months after closing, the first part of the guarantee expired. Although the actual market price for KDI stock was around $19.00 per share at that time, the price formula required by the Reorganization Agreement resulted in a price of $22.70 per share. Under the guarantee at that date the plaintiffs were not entitled to any additional shares.

D. The Court need not find, but will accept *arguendo* for the purposes of this order, that in March of 1970 the plaintiffs decided to sell the 23,647 KDI shares covered in the first part of the guarantee, since such shares were no longer protected, and, that the plaintiffs were dissuaded from selling by certain representations as to the impending listing on the New York Stock Exchange of KDI stock, made by two of the defendants herein.

E. On April 8, 1970, the parties entered into an extension agreement which reinstated the first six months price guarantee (the first part of the guarantee) and extended its expiration date of March 1, 1970, to a date 150 days after listing of the KDI stock on the New York Stock Exchange. In consideration for this extension, the plaintiffs agreed that they would not sell the 23,647 shares subject to this extended guarantee until 60 days after such listing.[2]

2. The extension agreement reads, in full, as follows:

AGREEMENT

THIS AGREEMENT made and concluded at Cincinnati, Ohio, this 8th day of April, 1970, by and between KDI CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereinafter sometimes referred to as "KDI," and E. L. GAUDIN and M. W. GAUDIN, sometimes hereinafter collectively referred to as "Gaudins,"

WITNESSETH:

THAT, WHEREAS, Gaudins are the owners of 87,197 shares of the Common Stock of KDI; and

WHEREAS, of the total number of shares of KDI Common Stock acquired by Gaudins, 23,-647 shares were guaranteed by KDI to have a market value of $22.00 per share from September 1, 1969, to March 1, 1970, and such guarantee is no longer in effect; and

WHEREAS, Gaudins have indicated an interest in selling some or all of the aforesaid 23,647 shares of Common Stock of KDI, but have indicated a willingness to refrain from selling said shares provided KDI will extend the guarantee for a certain period of time,

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter contained, the parties agree as follows:

1. Gaudins hereby promise and agree that they will refrain from selling, or offering for sale, 23,647 shares of Common Stock of KDI, said shares being the ones on which KDI had guaranteed the price to March 1, 1970, from the date of this Agreement to a period sixty

F. In September, 1970, plaintiffs exercised their rights under the second part of the guarantee (the one-year provision) and received an aggregate of 80,668 additional KDI shares thereunder. In May of 1971, plaintiffs applied for and received under KDI's Plan of Arrangement confirmed under Chapter XI of the National Bankruptcy Act, 72,714 additional KDI shares in settlement of their rights under the first and third parts of the guarantee (the six-months and two-years provisions).

G. This lawsuit does not challenge the Reorganization Agreement by which KDI acquired Herbert and plaintiffs acquired their KDI stock, nor does it challenge the stock value guarantees in that Agreement or anything else involved in the 1969 transaction. Plaintiffs assert that they have been injured by the decision not to sell the 23,647 shares of KDI stock in March, 1970 which was allegedly induced by representations made to them by the defendants herein, which representations were violative of the provisions of the federal securities laws.

Other fact issues material to specific portions of this order will be discussed where pertinent.

## II. *Do Plaintiffs Herein Have Standing Under the Birnbaum-Blue Chip "Purchase or Sale" Requirement?*

This issue is raised in the motion and memorandum of defendant KDI (doc. 13, pp. 7–11) and is adopted by defendants Hartsock, Walter G. Cox, and Cors, Hair and Hartsock.

(60) days after the listing of KDI Common Stock on the New York Stock Exchange, it being the mutual understanding of the parties that a formal listing application will be filed with the New York Stock Exchange by KDI not later than June 30, 1970.

2. In consideration of the foregoing, KDI hereby promises and agrees that it will extend the guarantee of a market value of $22.00 per share to the aforesaid 23,647 shares of KDI Common Stock for a period from the date of this Agreement to a date one hundred and fifty (150) days after the effective date of listing of the Common Stock of KDI Corporation on the New York Stock Exchange.

The specific question relating to the plaintiffs herein is a part of the general area of law concerning the private plaintiffs' rights to maintain a civil action for damages under the federal securities statutes. This general area of law surrounding Rule 10b–5 has been described by the Supreme Court as having a "peculiar blend of legislative, administrative, and judicial history."[3] This "peculiar blend" began with the legislative enactment of the Securities Act of 1933, which is best described as a disclosure statute, and the Securities Exchange Act of 1934, which is a regulatory statute. Title II of the 1934 Act is an amendment to the 1933 Act, and it is Section 10 of the 1934 Act that makes it "unlawful for any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." In 1942 the Securities and Exchange Commission, pursuant to the enabling authority of Section 10(b), promulgated Rule 10b–5 thereunder (17 C.F.R. § 240.-10b–5) which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

This Agreement shall be binding upon the heirs, devisees, legatees, executors, administrators, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, KDI Corporation has caused its corporate name to be hereunto affixed by its duly authorized President and Secretary, and E. L. Gaudin and M. W. Gaudin have hereunto set their hands all on the day and year first above written.

3. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975).

cumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

While there is no language in either Section 10(b) or in Rule 10b–5 explicitly providing for a civil remedy, the federal courts, since the decision in *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa. 1946), have repeatedly held that such a cause of action exists. *Ernst & Ernst v. Hochfelder*, 423 U.S. 816, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 L.W. 4451, 4455 (March 30, 1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

Having judicially found that a civil cause of action exists, it is incumbent upon the judiciary to delineate the confines of that right.

We quite agree that if Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability. But as we have pointed out, we are not dealing here with any private right created by the express language of § 10(b) or of Rule 10b–5. No language in either of those provisions speaks at all to the contours of a private cause of action for their violation. However flexibly we may construe the language of both provisions, nothing in such construction militates against the *Birnbaum* rule. We are dealing with a private cause of action which has been judicially found to exist, and which will have to be judicially delimited one way or another

unless and until Congress addresses the question.

*Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 749, 95 S.Ct. at 1931. In the *Blue Chip Stamps* case the Supreme Court went on to conclude that the *Birnbaum* rule "is a sound rule and should be followed."

The *Birnbaum* rule stems from the seminal case of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), where the court adopted a narrow approach in determining the limits of the judicially created private cause of action under the securities laws. In that case the plaintiffs were stockholders in the Newport Steel Corporation. When the defendant Feldmann, the president of their corporation, sold his stock to the Wilport Company, the shareholders brought suit. The action was essentially a shareholders derivative suit alleging a breach of fiduciary duty by corporate insiders resulting in fraud upon the corporation. In relation to the transaction in question, however, the plaintiffs did not purchase or sell any securities. In construing the "in connection with the purchase or sale of any security" language of the Rule, the *Birnbaum* court held that:

> [Section 10] was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and that Rule X–10B–5 extended protection only to the defrauded purchaser or seller.

This is the beginning of the "Birnbaum Doctrine" and the "purchaser or seller requirement" for a plaintiff to have standing to sue under Rule 10b–5.

Subsequent to the *Birnbaum* decision, two attempts were made by the Securities and Exchange Commission to have the "in connection with the purchase or sale of any security" language of Section 10(b) changed to "in connection with the purchase or sale of, *or any attempt to purchase or sell,* any security." These attempts to amend the 1934 Act were made in 1957 and 1959, and both attempts failed to be adopted by Con-

gress.[4] In support of the *Birnbaum* holding, the Supreme Court cites some twenty years of judicial consideration.

Just as this Court had no occasion to consider the validity of the *Kardon* holding that there was a private cause of action under Rule 10b–5 until 20-odd years later, nearly the same period of time has gone by between the *Birnbaum* decision and our consideration of the case now before us. As with *Kardon*, virtually all lower federal courts facing the issue in the hundreds of reported cases presenting this question over the past quarter century have reaffirmed *Birnbaum's* conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b–5 private damage actions is limited to purchasers and sellers of securities (citations omitted).

*Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 731, 732, 95 S.Ct. at 1923.

Since numerous references have been made to the Supreme Court's decision in the *Blue Chip Stamps* case, the facts therein should be considered.

The Blue Chip Stamp Co. (Old Blue Chip) was merged into a newly formed corporation, Blue Chip Stamps (New Blue Chip). New Blue Chip was required to offer a substantial number of its shares of common stock to retailers who had used the stamp service in the past but who were not stockholders in the old company. This was intended to reduce the holdings of the majority shareholders pursuant to an antitrust consent decree. Manor Drug Stores contended that the offer was made to them in terms that were overly pessimistic so as to dissuade offerees from purchasing the shares. They asserted fraud in that New Blue Chip would later offer the rejected shares to the public at a higher price. Manor Drug Stores elected not to purchase the securities and was therefore neither a purchaser or seller of securities. The Supreme Court adopted the *Birnbaum* rule and held

that since Manor Drug Stores was not an actual purchaser or seller of securities, they were barred from maintaining suit.

In *Blue Chip Stamps*, the Supreme Court stated the *Birnbaum* rule in three distinct categories.

Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. First are potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. *Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation* or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5 [emphasis added].

*Blue Chip Stamps v. Manor Drug Stores, supra,* at 737–738, 95 S.Ct. at 1926.

In the case presently before this Court the plaintiffs allege that based upon defendants' representations they decided not to sell their stock. This is the reverse of the fact situation in *Blue Chip Stamps* where the Manor Drug Stores decided not to buy stock, but is clearly included in the Supreme Court's second classification of potential plaintiffs.

A fact situation similar to the one herein was presented in a recent decision by the United States Court of Appeals for the Sixth Circuit in *Marsh v. Armada Corporation,* 533 F.2d 978 (6th Cir. 1976). Armada Corporation attempted to acquire a majority of the stock in Hoskins Manufacturing Company. Armada offered twenty dollars per share for Hoskins stock which was sell-

---

**4.** For citations see: *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 732, 95 S.Ct. 1917.

ing for about fifteen dollars per share, and declared in its tender offer that it intended, if successful, to discontinue the dividend paid to Hoskins shareholders, and to merge Hoskins into Armada. Based upon a statement in the tender offer that "we believe that those Hoskins shareholders who retain their shares will be satisfied with the merger," plaintiffs did not sell their Hoskins stock and brought suit under Rule 10b–5. Material herein is the following statement:

> The shareholders claim that the statement contained in the letter, " . . . we believe that those Hoskins shareholders who retain their shares will be satisfied with the merger . . . " caused them to retain their shares, to their loss, rather than sell or tender the shares to Armada, and that the statement was false and fraudulent. The shareholders have no standing to sue on this basis. This is the precise type of claim which the *Birnbaum* rule was intended to prevent, i. e., the "reliance by inaction" claim. *Marsh v. Armada Corporation, supra*, p. 981.[5]

■ The undisputed facts of this case do not show any purchase or sale of any security in connection with the transaction in question. The plaintiffs complain that they were induced into signing the April 8, 1970, agreement by fraudulent statements made by defendants herein; and that pursuant to such agreement they did not sell the stock as to which the first part of the original warranty had expired. For the purposes of this jurisdictional inquiry, all that the de-

fendants did was to extend a warranty, and all that the plaintiffs did was agree not to sell their stock.[6] There was no purchase, and no sale. There are only two operative sentences in the agreement. The first is that the Gaudins "promise and agree that they will refrain from selling . . . ." and the second is that KDI "promises and agrees that it will extend the guarantee of a market value of $22.00 per share . . . ."[7] To the extent that the agreement is anything other than a guarantee extension, it is a promise not sell. There is no aspect of the transaction in question that qualifies the plaintiffs herein as purchasers or sellers of securities. Accordingly, this Court lacks jurisdiction and this complaint must be dismissed.

■ The foregoing constitutes a dispositive and final order of this Court appealable in accordance with 28 U.S.C. § 1291. No discussion of other questions, particularly that of the statute of limitations, need be made. However, there are practical considerations that impel this Court to do so.

This order is issued in June of 1976. In the ordinary course of appeal this matter would probably not be considered by the United States Court of Appeals for the Sixth Circuit prior to October, 1977. If this matter were thereupon returned to this Court, a ruling on the statute of limitations question would once again open the way to a year of further appellate consideration. The prospect of counsel and litigants spending perhaps the next three years on a judicially imposed "voyage of the Flying Dutch-

---

5. On other grounds, relating to the exchange of shares in the merger, the Court found that the plaintiffs had standing, and went on to find that conduct actionable as a breach of fiduciary duty is not necessarily actionable as federal Rule 10b–5 fraud, and affirmed the District Court's dismissal of the complaint.

6. One might argue, from a logical perspective, that a successful inducement to retain stock or to not sell stock is similar to a successful inducement to purchase stock; and that since the latter inducement, if fraudulent, is actionable, the former should not be barred. The Supreme Court, however, has foreclosed this line of argument. In the *Blue Chip Stamps* case the United States Court of Appeals for the Ninth

Circuit, before the appeal to the Supreme Court, held in favor of the argument put forth above, citing decisions from several Circuits. *Manor Drug Stores v. Blue Chip Stamps*, 492 F.2d 136, 140 (9th Cir. 1973), rev'd. 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539. The Supreme Court ruled against this argument specifically, based primarily upon the difficulties inherent in the nature of proof necessary to sustain a claim that one had not purchased stock due to a fraudulent misrepresentation. See: 421 U.S. at 744–749, 95 S.Ct. 1917, for the Supreme Court's analysis here.

7. For the entire text of the April 8, 1970, agreement, see footnote 2, *supra*.

man" is distasteful to this Court. Solely for the purpose of avoiding this possibility, the Court will at this time likewise consider the issue of the statute of limitations.

### III. Are The Plaintiffs Barred By The Statute Of Limitations Applicable To Federal Securities Violations?

This issue is raised in the motion and memorandum of defendants Hartsock and Cors, Hair & Hartsock (doc. 14, pp. 3–11).

■■■ The first question that is presented here relates to the selection of the appropriate statute. Where, as here, a federally created cause of action is not governed by a federal statute of limitations, the statute to be applied is the state statute of limitations which best effectuates the policy of the substantive federal statute in question. *A.F.L.–C.I.O. v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Charney v. Thomas*, 372 F.2d 97, 99–100 (6th Cir. 1967). In Ohio there are two statutes that appear to bear directly upon the issues herein. The first is the two-year statute that is applicable to actions arising under the Ohio Securities Act, §§ 1707.41, 1707.43, Ohio Revised Code. The second is the four-year general fraud statute of limitations found in § 2305.09(C), Ohio Revised Code. The controversy surrounding the question as to which statute applies has been previously decided by this Court in favor of the longer general fraud statute,[8] O.R.C. § 2305.09(C). *DeVoe v. Ostrander*, Civil No. C–3–74–95, Order of March 31, 1976 (S.D.Ohio, citing *France v. Cashman*, Civil No. 73–49, Order of April 16, 1974 (S.D.Ohio), opinion per Kinneary, J.

■■■ The next determination concerns the commencement of the statute of limitations period. While a state statute of limitations must be used where a federal cause of action contains no limitations period, this use of the state statute extends no further than to adopt the time period specified in the state statute. It is federal common law that determines when the statute begins to run.[9]

. . . It would be too incongruous to confine a federal right within the bare terms of a State statute of limitations unrelieved by the settled federal equitable doctrine as to fraud, when even a federal statute in the same terms would be given the mitigating construction required by that doctrine.

*Holmberg v. Armbrecht*, 327 U.S. 392, [397], 66 S.Ct. 582, 90 L.Ed. 743 (1946) held that where the cause of action is federal in origin but a forum state's statute of limitations is being used, and the

---

**8.** This precise issue is presently awaiting decision in the United States Court of Appeals for the Sixth Circuit. The leading case in this circuit on this subject is *Charney v. Thomas, supra*, in which the Court, in a Michigan case, applied the Michigan six-year statute of limitations for common law fraud rather than the two-year statute in the Michigan Blue Sky Law. The *Charney* decision was recently reaffirmed in *I. D. S. v. First of Michigan Corp.*, 533 F.2d 340 (6th Cir. 1976), No. 75–1475, decided and filed April 16, 1976. However, due to the differences between the Blue Sky laws of Ohio and Michigan, the prior holdings cannot accurately predict which of the two Ohio statutes the Court will apply. Two consolidated cases precisely on this point, one from each federal district in Ohio, have been argued and are presently awaiting decision: *Nickels v. Koebler Management Corp.*, No. 75–1684, argued December 18, 1975, and *McIntyre v. First National Bank of Cincinnati*, No. 75–2200.

**9.** The federal law determines when the statutory time period begins to run even where, as

here, the state statute contains a specific direction as to when the time period begins to run. The entire test of Ohio Rev.Code § 2305.09 is as follows:

§ 2305.09 Four Years; certain torts. (GC § 11224)

An action for any of the following causes shall be brought within four years after the cause thereof accrued:

(A) For trespassing upon real property;

(B) For the recovery of personal property, or taking or detaining it;

(C) For relief on the ground of fraud;

(D) For injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12, inclusive, 2305.14, and 1307.08 of the Revised Code.

If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered.

action is equitable in nature, federal law applies in regard to determining the date on which a statute of limitations begins to run. Federal law since the case of *Bailey v. Glover*, 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 636 (1875) has been that in cases involving elements of fraud neither a statute of limitations nor the equitable doctrine of laches can be said to begin to run until the fraud is or should have been discovered. The doctrine that federal law applies in determining the date on which the statute of limitations begins to run was extended in *Moviecolor Limited v. Eastman Kodak Company*, 288 F.2d 80, 90 A.L.R.2d 252 (2d Cir. 1961) (dictum), cert. denied 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961) to include cases at law as well as equity if the cause of action is federal in nature and even though a state statute of limitations applies.

*Vanderboom v. Sexton,* 422 F.2d 1233, 1240 (8th Cir. 1970); See also: *Parrent v. Midwest Rug Mills, Inc.* 455 F.2d 123, 128 (7th Cir. 1972).

Accordingly, the four-year time period set forth in Ohio Rev.Code § 2305.09 will be used and this four years will be deemed to commence when "the fraud is or should have been discovered." *Vanderboom v. Sexton, supra.* An excellent short discussion of the standard to be applied here is found in the case of *Hupp v. Gray,* 500 F.2d 993 (7th Cir. 1974) as follows:

> . . . It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute. *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir. 1969); *Laundry Equip. Sales Corp. v. Borg-Warner Corp.,* 334 F.2d 788, 792 (7th Cir. 1964). The plaintiff, rather, has the burden of showing that he "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Morgan v. Koch, supra,* 419 F.2d at 997. The statutory period "[does] not await appellant's leisurely discovery of the full details of

the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).

*Hupp v. Gray, supra* at 996.

■ There are several objective indicia of when the fraud should have been discovered, if plaintiff had exercised reasonable diligence. Three of these objective indicia are:

1. The status of the stock in relation to its position on the natural stock exchanges;

2. The relative values of the stock during the time in question; and

3. The existence of other lawsuits against the defendant company.

These three indicia were involved in the case of *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402 (2d Cir. 1975) where the Court stated:

> . . . In light of the trading suspensions, the precipitous decline in the price of CUC stock, and the other lawsuits by the SEC and private parties, we think that Judge McFadden correctly concluded that plaintiffs with reasonable diligence could and should have discovered the alleged fraud prior to December 15, 1969.

*Klein v. Shields & Co., supra,* 470 F.2d at 1347; *Azalea Meats, Inc. v. Muscat,* 386 F.2d [5] at 8–9 (5th Cir. 1957).

*Berry Petroleum Co. v. Adams & Peck, supra,* at 410.

Plaintiff's complaint cites several instances where the plaintiffs were advised that the KDI stock was "very shortly to be listed on the New York Stock Exchange," and "the listing was a mere formality and would be accomplished within a short period of time." [10] KDI stock was never listed on the New York Stock Exchange. KDI filed bankruptcy in December of 1970, only nine months after the April 8, 1970, agreement. In light of the glowing promises allegedly made by the defendants, the fact that the stock was never listed on the New York Stock Exchange should have put the plaintiffs on notice that something was wrong.

---

**10.** See the complaint filed herein, Document 1, filed May 15, 1975, at paragraph 14(a) and (b) and paragraph 16(a). These matters were re-stated in the plaintiffs' memorandum in opposition to the motions for summary judgment, Document 16, filed January 26, 1976, at p. 13.

As to the relative values of the stock during the time in question on the over-the-counter market, defendant Hartsock's Exhibit M is quite eloquent.

OVER–THE–COUNTER QUOTATIONS KDI CORPORATION
EAST COAST EDITION—WALL STREET JOURNAL

| Market Date | Journal Date | Bid | Asked |
|---|---|---|---|
| 4/1/70 | 4/2/70 | 18.50 | 19.25 |
| 5/1/70 | 5/4/70 | 12.25 | 13.25 |
| 6/1/70 | 6/2/70 | 11.00 | 11.50 |
| 7/1/70 | 7/2/70 | 6.38 | 6.88 |
| 8/3/70 | 8/4/70 | 6.75 | 7.25 |
| 9/1/70 | 9/2/70 | 4.50 | 4.75 |
| 10/1/70 | 10/2/70 | 5.00 | 5.50 |
| 11/2/70 | 11/3/70 | 3.12 | 3.38 |
| 12/1/70 | 12/2/70 | 2.50 | 2.75 |

Hartsock Exhibit M.

In eight months KDI dropped from the $18–$19 range to the $2.50–$2.75 range. The plaintiffs were aware of this situation,[11] or they should have been, in the exercise of due diligence. It is inconceivable that plaintiffs took no notice of a drop in stock value from in excess of $400,000 to less than $60,000.00. The nature of the decline in the stock value should have put the plaintiffs on notice that something was wrong.

A consideration of the third indicia, that of other lawsuits, reveals that during the time in question there were five separate lawsuits brought against KDI for violations of the federal securities laws. The plaintiffs were aware of these lawsuits.[12] The plaintiffs' awareness of the existence and the nature of these lawsuits was also notice that something was wrong.

■ In light of the failure of KDI stock to be listed on the New York Stock Exchange between April, 1970, and December, 1970, the precipitous and steady decline in the price of the KDI stock sold over-the-counter during the same period, and other lawsuits filed prior to the December 21, 1970, meeting, the plaintiffs with reasona-

ble diligence could and should have discovered the alleged fraud prior to January of 1971. The Court holds that as a matter of law the statute of limitations applicable herein began to run on December 31, 1970. The complaint herein was not filed until May 15, 1975, more than four years later, and five and a half months after the time for filing had expired. Accordingly, the Court holds that the complaint was not timely filed, and that the defendants herein are entitled to judgment.

IV. *Are Plaintiffs' State Law Malpractice Claims Cognizable in Federal Court?*

This issue is raised in the motion and memorandum of defendants Hartsock, and Cors, Hair & Hartsock (doc. 14, pp. 12–15).

The defendants contend that the malpractice statute of limitations (O.R.C. § 2305.11) bars plaintiffs' recovery herein. They claim that under Ohio law plaintiffs' malpractice action must be brought within one year after the cause of action accrued, or the professional relationship terminates, whichever is later, citing *Keaton Co. v. Colbey*, 27 Ohio St.2d 234, 271 N.E.2d 772 (1971); and this is so notwithstanding sub-

11. See the motion for summary judgment of defendants Hartsock and Cors, Hair & Hartsock, Document No. 14, filed December 15, 1975, at p. 6, citation to the First Request of Admissions, ¶ 4.

12. See the notes of Gordon Scherer, plaintiffs' attorney, and Robert Barnes, plaintiffs' accountant, taken during the December 21, 1970 meeting called by KDI to disclose the lawsuits and the intention to file for bankruptcy. Hartsock Exhibits K and O. See also defendants Hartsock's and Cors, Hair & Hartsock's motion for summary judgment, Document 14, filed December 15, 1975, at p. 6, citation to First Request for Admissions paragraphs 24, 30–35.

sequent discovery by the client of injury or damage, citing *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971). Defendants lastly contend that the plaintiffs herein filed their complaint far beyond the time allotted for such action.

The plaintiffs contend that the attorney-client professional relationship existed up and until within one year of the filing of the instant lawsuit. However, the Court need not resolve the questions presented by the instant issues.

 The malpractice claim is one authorized under the laws and the jurisdiction of the State of Ohio. In filing the instant complaint in federal court, invoking this court's federal question jurisdiction under the securities laws, the plaintiffs may properly include state claims in their complaint pursuant to this court's pendent jurisdiction. The applicable standard, which has been met here, is that the plaintiffs must allege substantial federal claims as the primary basis for jurisdiction, and the state law claims must be derived from the same "nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Travis v. Anthes Imperial Limited*, 473 F.2d 515, 528 (8th Cir. 1973); *Ryan v. J. Walter Thompson Company*, 453 F.2d 444, 446 (2d Cir. 1971).

 Although the plaintiffs have properly invoked the court's pendent jurisdiction, the exercise of that jurisdiction is not a matter of right, it is a matter committed to the sound discretion of the trial court.

That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers v. Gibbs, supra*, 383 U.S. at 726, 86 S.Ct. at 1139.

 This Court hereby finds that in light of the prior rulings in this order dismissing the federal causes of action, if the malpractice claim were to go forward it would be adverse to considerations of judicial economy, and it would be extremely inconvenient and unfair to the litigants. Therefore, based upon the considerations mentioned above, and in the exercise of this Court's discretion, the issues relating to the malpractice claims brought pursuant to this Court's pendent jurisdiction are hereby dismissed.

### CONCLUSIONS OF LAW

A. There being no genuine issue as to any material fact this Court may grant summary judgment pursuant to Rule 56, Fed.R.Civ.P., where a movant, as here, is entitled to judgment as a matter of law.

B. Plaintiffs falling within a proscribed classification established in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, as here, lack standing to assert a Rule 10b–5 violation.

C. The applicable statute of limitations herein, O.R.C. 2305.09(C), commenced to run December 31, 1970. Plaintiffs' failure to file a complaint within four years of such date bars recovery.

D. In view of conclusions of law B & C, the pendent state law malpractice claim should be, and is hereby, dismissed.

E. No costs or attorney fees will be assessed. Each party will bear its own costs and attorney fees.

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.