## Stuart E. HAYNES, Jr. et al.

v.

## ANDERSON & STRUDWICK, INC. et al.

### Civ. A. No. 80–0732–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 3, 1981.

D. J. Esposito, and H. Jack Armstrong, Richmond, Va., for plaintiffs.

Thomas E. Spahn, McGuire, Woods & Battle, James F. Morano, Jr., Richmond, Va., for defendants.

## MEMORANDUM AND ORDER

WARRINER, District Judge.

This consolidated action involves alleged federal securities laws violations. Specifically, plaintiffs Stuart E. Haynes, Jr. (Haynes, Jr.) and Stuart E. Haynes, Sr. (Haynes, Sr.) claim that defendants Anderson & Strudwick, Inc. (Anderson & Strudwick), a Virginia broker-dealer, and Thomas V. Blanton, Jr. (Blanton), a former employee of Anderson & Strudwick, violated the Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a), (the 1933 Act), the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), (the 1934 Act), and Rules 10b–5 and 10b–16, 17 C.F.R. §§ 240.10b–5, —16, promulgated under the 1934 Act by the United States Securities and Exchange Commission. Haynes, Sr., also asserts two

pendent claims against defendants, one for conversion and the other for breach of contract.[1] Jurisdiction is obtained under § 22 of the 1933 Act, 15 U.S.C. § 77v, and § 27 of the 1934 Act, 15 U.S.C. § 78aa.

The parties are presently before the Court with respect to defendants' separate motions to dismiss plaintiffs' Complaint for lack of standing, Fed.R.Civ.P. 12(b)(1), and for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), and with respect to Haynes, Jr.'s, motion to dismiss Blanton's counterclaim, apparently, for failure to state a claim upon which relief can be granted. The parties have briefed the issues and the motions are ripe for disposition.

## I.

Briefly stated, plaintiffs, in their Complaint, make the following allegations which will be accepted as true for present purposes. In September, 1978, plaintiffs consulted Blanton concerning the purchase of stock in Shoney's, Inc., (Shoney's) and they placed orders with Blanton to purchase specified amounts of Shoney's stock. Upon receipt of their transaction statements in October, 1978, plaintiffs learned that Blanton had purchased Shoney's stock in excess of the orders and, in addition, had purchased shares in C.H.B. Foods, Inc., (C.H.B.) for plaintiffs, along with shares in Sierracin Corporation for Haynes, Sr. Apparently plaintiffs contend that Blanton purchased this stock by placing plaintiffs on margin accounts without authority and extended credit to them in connection with these security transactions without disclosing the terms of the credit agreements in violation of Rule 10b–16.

Upon plaintiffs learning of this transaction, Blanton persuaded them to retain the C.H.B. stock, informing them on the basis of what plaintiffs alleged to be inside information that the price was certain to go up as a result of the imminent takeover of

C.H.B. by General Foods Corporation (General Foods). In reliance upon Blanton's advice and representations, plaintiffs retained the C.H.B. stock and requested Blanton to purchase additional shares of C.H.B.

In November, 1978, Blanton solicited plaintiffs to purchase additional shares of C.H.B. Again, in reliance upon Blanton's information, plaintiffs directed Blanton to do so. Haynes, Jr., also claims that in January, 1979, Blanton began making unauthorized purchases of C.H.B. stock on behalf of Haynes, Jr. Haynes, Jr., instructed Blanton not to purchase additional shares of C.H.B. stock because he would not pay for them. Haynes, Jr., was assured by Blanton that it would not be necessary for Haynes, Jr., to pay for the purchases.

When the General Foods acquisition of C.H.B. had not materialized by January, 1979, plaintiffs determined to sell their shares of C.H.B. and instructed Blanton accordingly. Blanton again represented to plaintiffs that the acquisition was going to take place and that an increase in the value of the C.H.B. stock was certain. In addition, Blanton disclosed to Haynes, Jr., that he owned several thousand shares of C.H.B. stock himself, so that there was no need for Haynes, Jr., to be concerned. Plaintiffs claim that ultimately Blanton refused to sell their shares of C.H.B. stock.

The takeover of C.H.B. by General Foods did not materialize and in February, 1979, the Securities and Exchange Commission suspended trading in C.H.B. stock. As a result, the price of C.H.B. stock diminished substantially, causing plaintiffs to suffer damages. Plaintiffs claim that throughout the various discussions with and solicitations by Blanton, they were unaware that Blanton's representations concerning C.H.B. were untrue.

## II.

Anderson & Strudwick's initial ground for dismissal is that the Complaint's recita-

---

1. Plaintiffs' several claims for relief, save for Haynes, Sr.'s, pendent claims, were lumped together in the Complaint without any apparent organization or distinction. The preferred practice of pleading is to state various claims for relief in separate counts. *See* Fed.R.Civ.P.

10(b). Otherwise, the onus, as in this case, is on the court to decipher which facts support which claims, as well as to determine whether plaintiffs are entitled to the relief sought. This type of pleading does a disservice to the court and, more importantly, to the client.

tion of federal securities law violations fails to mention any involvement by Anderson & Strudwick.[2] Anderson & Strudwick asserts that the only specific conduct and statements plaintiffs allege as violating § 10(b) and Rule 10b–5 are the alleged conduct and statements of Blanton. It is Anderson & Strudwick's contention, then, that from the Complaint the only basis for its liability is under the common law doctrine of *respondeat superior.* Anderson & Strudwick argues, however, that the doctrine of *respondeat superior* was supplanted in the federal securities laws by Congress' enactment of "controlling person" provisions in both the 1933 Act[3] and the 1934 Act.[4] Since plaintiffs have failed to state a cause of action under the appropriate controlling person provision, § 20(a) of the 1934 Act, Anderson & Strudwick contends that plaintiffs' Complaint should be dismissed as to the broker-dealer. Plaintiffs, on the other hand, apparently contend that Anderson & Strudwick is subject to liability under both § 20(a), the controlling person provision, and the doctrine of *respondeat superior.*

A review of the law reveals that the circuits are split on the issue presented. In the Ninth Circuit the rule is firmly embedded that the controlling person provision found in § 20(a), and not the doctrine of *respondeat superior*, is the appropriate standard for determining liability of a broker-dealer for the acts of its employee in viola-

tion of the 1934 Act. *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Douglass v. Glen E. Hinton Investments, Inc.*, 440 F.2d 912, 914 (9th Cir. 1971); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 438–39 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202, 1210 (9th Cir. 1970); *Kamen & Co. v. Paul H. Aschkar & Co.*, 382 F.2d 689, 697 (9th Cir.), *cert. granted*, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129, *cert. dismissed*, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1967); *Jackson v. Bache & Co., Inc.*, 381 F.Supp. 71, 93–5 (D.C.1974). The Third Circuit is in accord. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884–86 (3d Cir. 1975); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 586 (3d Cir. 1975). *Cf. Sharp v. Coopers & Lybrand*, 457 F.Supp. 879, 890–91 (D.C.Pa.1978) (holding that *Rochez* did not foreclose *respondeat superior* liability for broker-dealers for the fraudulent acts of their employees). The Eighth Circuit would seem to be in agreement with the Ninth and Third Circuits, though that circuit has not taken a definitive position. *Myzel v. Fields*, 386 F.2d 718, 737–38 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (the liability of controlling persons "is governed neither by principles of agency nor conspiracy." *Id.* at 738).

The Sixth and Seventh Circuits have taken the position that the controlling person statutes in the 1933 Act and the 1934 Act do not preclude *respondeat superior* liability

---

**2.** Anderson & Strudwick's contention is not entirely correct because plaintiffs allege that "defendants" violated Rule 10b–16, which requires the disclosure of credit information. Thus, the Court will limit Anderson & Strudwick's argument to the claims asserted by plaintiffs under § 10(b) and Rule 10b–5.

**3.** Section 15 of the 1933 Act, as amended, 15 U.S.C. § 77*o*, provides:

Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 [15 U.S.C. § 77k] or 12 [15 U.S.C. § 77*l*], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom

such controlled person is liable, unless the controlling person has no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**4.** Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), provides in pertinent part:

Every person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C. §§ 78a et seq.] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

under the federal securities laws. *Holloway v. Howerdd*, 536 F.2d 690, 694–95 (6th Cir. 1976); *Armstrong, Jones & Co. v. Securities & Exchange Commission*, 421 F.2d 389, 361–62 (6th Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1051–52 (7th Cir. 1974). *United States Law Week* has recently reported that the Fifth Circuit has taken a similar position in *Paul F. Newton & Co. v. Texas*, 630 F.2d 1111 (5th Cir. 1980). The First Circuit has not had an occasion to address the issue, however, a district court in that circuit has concluded that § 20(a) and the common law doctrine of *respondeat superior* are complementary rather than exclusive remedies. *Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 214 (D.Mass.1978).

The Tenth Circuit has not expressly decided the controlling person-*respondeat superior* issue. *See Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974); *Richardson v. MacArthur*, 451 F.2d 35, 41–42 (10th Cir. 1971).

The position of the Second Circuit is difficult to discern. Apparently as a result of that circuit's decision to consider the issue on a case by case basis, it has authority seeming to support both positions. *Compare SEC v. Geon Indus., Inc.*, 531 F.2d 39, 54–56 (2d Cir. 1976); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 811–13 (2d Cir. 1975); *Rolf v. Blyth, Eastman, Dillon & Co., Inc.*, 424 F.Supp. 1021, 1043–44 (S.D.N.Y.1977), *nonacq.*, 570 F.2d 38, 48 (2d Cir. 1978) *with Lanza v. Drexell & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973); *Barthe v. Rizzo*, 384 F.Supp. 1063, 1068–70 (S.D.N.Y.1974); *Gordon v. Burr*, 366 F.Supp. 156, 167–68 (S.D.N.Y.1973), *partially modified on other grounds*, 506 F.2d 1080 (2d Cir. 1974); *SEC v. Lums, Inc.*, 365 F.Supp. 1046, 1061–64 (S.D.N.Y.1973).

The position of the Fourth Circuit is ambiguous. In *Johns Hopkins University v. Hutton*, 297 F.Supp. 1165, 1210–13 (D.Md. 1968), *aff'd in part, rev'd in part & remanded*, 422 F.2d 1124 (4th Cir. 1970), Judge

Kaufman, in the District Court, addressed the controlling person—*respondeat superior* issue in the context of the controlling person provision found in § 15 of the 1933 Act. The defendant broker-dealer argued that the measure of its liability for the acts of its employees in violation of § 12(2) of the 1933 Act, was to be determined under § 15. Judge Kaufman ruled that § 15 did not apply to employer (broker-dealer)—employee relationships. *Id.* at 1211. Recognizing that there was scant legislative history on the subject, Judge Kaufman nevertheless concluded that Congress did not intend § 15 "to serve as a limitation on liability." *Id.* (footnote omitted). Rather, controlling person liability was intended to "supplement, and extend beyond, common law principles of agency and *respondeat superior.*" *Id.* at 1212. It appears that the primary basis for Judge Kaufman's decision was a concern that "[a] contrary conclusion would in effect give blessing to a hear-no-evil, see-no-evil approach by partners of a brokerage house which is hardly in keeping with the remedial purpose of the '33 Act...." *Id.*

On appeal the Fourth Circuit affirmed this portion of Judge Kaufman's opinion, stating that a broker-dealer "is liable, under familiar principles, for the tortious representations of its agent. Restatement (Second) of Agency §§ 257, 258 (1958)." *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1130 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). The Fourth Circuit agreed with Judge Kaufman's analysis that "Section 15 of the Act [15 U.S.C. § 77o] was not intended to insulate a brokerage house from the misdeeds of its employees." *Id.*

In *Carras v. Burns*, 516 F.2d 251 (4th Cir. 1975), the Fourth Circuit reaffirmed *Johns Hopkins*, holding that a broker-dealer's "liability for churning would not depend solely on its lack of supervision, but would also arise from familiar principles of an employer's vicarious liability. *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1130 (4th Cir. 1970)." *Id.* at 259.[5] The claim in *Car-*

**5.** Although the portion of *Carras* quoted in the text could possibly be read as endorsing concurrent liability for broker-dealers under agen-

cy principles and the controlling person provisions, there is no indication that the single paragraph in *Carras* was intended to add any-

*ras,* like the claim presently before this Court, arose under § 10(b) of the 1934 Act. Thus, under the doctrine of *stare decisis, Carras* would be controlling here if there were not conflicting case law in the Fourth Circuit.

In *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), the Fourth Circuit made its most recent examination of the controlling person provisions in the 1933 and 1934 Acts. In that case plaintiffs sought to hold a brokerage firm liable under either § 15 of the 1933 Act or § 20(a) of the 1934 Act, or both, for the acts of its employee which caused plaintiffs to suffer losses as purchasers of unregistered securities. The trial court granted summary judgment in favor of the brokerage firm. In affirming, Judge Hoffman, sitting by designation, made the following observations for the court concerning controlling person provisions:

> Noteworthy in each provision is the inclusion of a defense from liability based on "good faith" or lack of knowledge or reasonable belief. When originally passed by Congress, § 15 of the 1933 Act held controlling persons absolutely liable for § 11 and § 12 violations by controlled persons. Congress, in passing the 1934 Act, amended § 15 of the earlier Act, adding the language beginning at "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist." Likewise, the controlling person provision in the new Act, § 20(a), contained the "good faith" defense to lia-

bility. Clearly Congress had rejected an insurer's liability standard for controlling persons in favor of a fiduciary standard—a duty to take due care. *Securities and Exchange Commission v. Lum's, Inc.,* 365 F.Supp. 1040, 1063 (S.D.N.Y.1973); see Annot. 32 A.L.R.Fed. 714, 719. The intent of Congress reflected a desire to impose liability only on those who fall within its definition of control and who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person. *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2nd Cir. 1973). The Supreme Court has noted that in each instance where Congress has created express civil liability in favor of purchasers or sellers of securities, it has clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 207–209, 96 S.Ct. 1375, 1387–1388, 47 L.Ed.2d 668 (1976). The controlling persons provisions contain a state-of-mind condition that requires a showing of something more than negligence to establish liability. *Id.* at nn. 27–28.

The most obvious manner in which to establish liability as a controlling person is to prove that a person acted under the direction of the controlling person. This most commonly occurs in an employer-employee relationship. The lack of such a relationship is not determinative, however. *Hawkins v. Merrill Lynch, Pierce, Fenner & Beane,* 85 F.Supp. 104 (W.D. Ark.1949). In order to satisfy the requirement of good faith it is necessary

---

thing new or different to the *Johns Hopkins* decision. *Compare Johns Hopkins, supra,* 422 F.2d at 1130 *with Carras, supra,* at 259. Accordingly, the Court will not read it as doing so. Moreover, for the reasons stated within, the Court does not believe that concurrent liability would be appropriate. *Carras* merely extended, by implication, the reasoning of *Johns Hopkins* respecting the 1933 Act to the controlling person provision found in § 20(a) of the 1934 Act.

In this connection, the Court believes that no moment should be given to whether this case arises under the 1933 Act. The availability of controlling person liability is the same under

either § 15 or § 20(a), despite the variations in language in the two provisions. This seems clear from the case law in the Fourth Circuit. *Johns Hopkins* involved a claim under § 15 of the 1933 Act. *Carras* adopted the *Johns Hopkins* rationale in a case arising under the 1934 Act, though it did not expressly mention § 20(a) thereof. In *Carpenter, infra,* the plaintiffs alleged liability under either § 15 or § 20(a), or both. Judge Hoffman's analysis of the two sections in that case, other than their history, was identical. Indeed, the other circuits and the commentators seem to be in agreement on this point.

for the controlling person to show that some precautionary measures were taken to prevent an injury caused by an employee. *Securities & Exchange Commission v. First Securities Company of Chicago*, 463 F.2d 981, 987 (7th Cir. 1972); *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1210 (9th Cir. 1970). *See also, Zweig v. Hearst Corporation*, 521 F.2d 1129, 1134–35 (9th Cir. 1975).

The primary duty owed by a broker-dealer to the public is to supervise its employees in an adequate and reasonable fashion. While the standards of supervision may be stringent, this does not create absolute liability for every violation of the securities laws committed by a supervised individual. *SEC v. Lum's, Inc.*, 365 F.Supp. at 1064. It is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner. *Hecht v. Harris, Upham & Co.*, 430 F.2d at 1210.

*Id.* at 393–94 (footnote omitted).

Conspicuously absent from *Carpenter* is any reference to the Fourth Circuit's prior decisions in *Johns Hopkins* and *Carras*. To the contrary, Judge Hoffman cites and relies upon *Zweig v. Hearst Corp., supra; Lanza v. Drexell & Co., supra;* and *SEC v. Lum's, Inc., supra*, all of which clearly support the theory that a broker-dealer's liability for the acts of its employee is measured under the controlling person provisions to the exclusion of agency principles of liability. The entire tenor of *Carpenter* is drastically different from that of *Johns Hopkins* and *Carras*. In the earlier cases, broker-dealer liability was vicarious, that is to say, absolute where an employee was in violation of federal securities laws. In *Carpen-*

ter, under the controlling person provisions, the Fourth Circuit determined that liability attaches to broker-dealers "who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person." *Carpenter, supra*, at 394.

After wrestling with the cases, this Court is of the opinion that the two lines of authority are irreconcilable. Admittedly, *Carpenter* does not expressly address the controlling person—*respondeat superior* issue as in *Johns Hopkins* and *Carras*. This in fact is the Court's major problem with *Carpenter*. Nonetheless, it is obvious that the Court cannot find only those broker-dealers liable under § 20(a) of the 1934 Act "who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person," and at the same time find broker-dealers absolutely liable under the common law doctrine of *respondeat superior*. The Court is thus faced with a dilemma as to which line of authority to follow in this case.[6]

The Court concludes that *Carpenter* is controlling here. The panel decided in *Carpenter*, in contrast to the decision in *Johns Hopkins* and the decisions in other circuits,[7] that the controlling person provisions apply to employer (broker-dealer)—employee relationships, as in this case. *See Carpenter, supra*, at 394 (controlling person liability "most commonly occurs in an employer-employee relationship"). *Johns Hopkins* and *Carras* have been overruled *sub silentio* on this point. In addition, Judge Hoffman concluded that "[c]learly Congress had rejected an insurer's liability standard for controlling persons in favor of a fiduciary standard—a duty to take due care." *Id.* Judge Hoffman further stated that "[w]hile

---

**6.** The observation by counsel for Anderson & Strudwick in a footnote in their Amended Memorandum in Support of Motion to Dismiss, at 5 n. 10, that "[t]wo earlier cases [*Johns Hopkins* and *Carras* ] arguably implied that *respondeat superior* liability is available . . ." is of no assistance to the Court in resolving this dilemma. The Fourth Circuit in *Johns Hopkins* and *Carras* did not "arguably imply," but *expressly held* that a *broker-dealer's* liability was to be determined under agency principles and not under the controlling person provisions.

*See Carras, supra*, at 250; *Johns Hopkins, supra*, 422 F.2d at 1130. Rather than trying to sweep conflicting case law under the carpet, counsel would do better to present the conflict fully and to advise the Court as to its proper resolution.

**7.** *See, e. g., SEC v. Management Dynamics, supra*, at 811–13; *Fey v. Walston & Co., Inc., supra*, at 1051–52; *Armstrong, Jones & Co. v. Securities & Exchange Comm'n, supra*, at 361–62.

the standards of supervision [imposed upon a broker-dealer] may be stringent, this does not create absolute liability for every violation of the securities laws committed by a supervised individual." *Id.* As these conclusions are in direct conflict with those in *Johns Hopkins* and *Carras,* the Court must conclude that the earlier cases have been superseded by *Carpenter.*

In so concluding, the Court is not unmindful of the fact that if *respondeat superior* were applicable, then, in many cases a broker-dealer could be liable both under the common law doctrine and under the applicable controlling person provision. In many cases, though, a broker-dealer could exculpate himself under § 20(a) by proving his "good faith," yet be absolutely liable under *respondeat superior.* The second situation would amount to a circumvention of the good faith defense. Once it is determined that the controlling person provisions are applicable to a broker-dealer, as the Fourth Circuit has done in *Carpenter,* the broker-dealer is entitled to the defenses provided therein. Moreover, the intent of Congress that controlling persons have certain defenses should not be thwarted by resort to common law agency principles that emasculate the controlling person defenses. *See Rochez Bros., Inc. v. Rhoades, supra,* at 885–86; *Jackson v. Bache & Co., Inc., supra,* at 95. Thus, the Court concludes that the two theories of liability cannot sensibly or fairly operate concurrently, nor does the Court believe that they were intended to do so. The inescapable implication from *Carpenter* is that § 20(a) is the exclusive standard of liability for a broker-dealer. This holding the Court is bound to follow.

The Court does so with some unease. It is generally understood that the federal securities laws were enacted by Congress for the benefit and protection of the investing public. Without the adoption of any controlling person provision in the 1933 or 1934 Acts, investors, such as plaintiffs, would have had a cause of action against a brokerage firm, such as Anderson & Strudwick, under agency principles for the fraudulent conduct of its employees. Upon the proof of a master-servant or principle-agent relationship, the broker-dealer's liability would have been absolute. With the enactment of § 15 of the 1933 Act and § 20(a) of the 1934 Act, Congress created a new class of defendants in securities cases—those "controlling persons" who could potentially evade liability for securities law violations by exercising their power through "dummy" corporations or by creating some other legal barrier. *See* Note, *The "Controlling Persons" Liability of Broker-Dealers for Their Employees' Federal Securities Violations,* 1974 Duke L.J. 824, 833–34 (1974) (hereinafter as "1974 Duke L.J."); Comment, *The Controlling Persons Provisions: Conduits of Secondary Liability Under Federal Securities Law,* 19 Vill.L.Rev. 621, 622–26 (1974) (hereinafter as "19 Vill.L.Rev."). Controlling persons, such as officers, directors and stockholders had theretofore been unavailable to suit by investors. Thus, the investing public's remedy for violations of the 1933 and 1934 Acts was expanded by the adoption of § 15 and § 20(a), respectively.

The problem encountered with the controlling person liability under § 15 was that it, too, was absolute. Apparently upon the insistence of officers and directors of brokerage firms, § 15 was amended in 1934 to provide a defense to controlling persons where they "had no knowledge of or reasonable ground to believe in the existence of facts" to support a securities law violation. *See* 19 Vill.L.Rev., *supra,* at 624. Section 20(a) of the 1934 Act was enacted with a similar defense of "good faith."

There appears, however, to be no legislative history that determines irrefutably that broker-dealers were intended by Congress to be included in the class of controlling persons. *See* 1974 Duke L.J., *supra,* at 833–34. There is some brief legislative history to § 20(a) from which it may be inferred that Congress intended controlling person liability to include broker-dealers:

In this section ... when reference is made to "control," the term is intended to include actual control as well as what has been called legally enforceable control.... It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control

may be exerted. A few examples of the methods used are stock ownership, lease, contract, and *agency....*

H.R.Rep.No.1383, 73d Cong., 2d Sess. 26 (1934) (emphasis added). *See also* 1974 Duke L.J., *supra*, at 834.

If Congress intended for § 15 of the 1933 Act and § 20(a) of the 1934 Act to apply to employer-employee relationships, as the Fourth Circuit has in effect concluded in *Carpenter, supra,* at 394, the end result is that the controlling person provisions act as limitations, rather than expansions, on liability for broker-dealers. Rather than being subject to vicarious liability merely upon the showing of an agency relationship, broker-dealers have a defense which had theretofore been unavailable. As a result the investing public has a less effective remedy under the securities laws against broker-dealers for the fraudulent conduct of employees, than under the common law. If Congress did indeed intend this result, no doubt the investing public will ask Congress not to do it any more favors. The Court believes that such a Congressional intent to limit broker-dealer liability would be curious since it is most often the reputation of the broker-dealer upon which the investor relies in making securities transactions. In this regard, the argument made by the Securities and Exchange Commission in its amicus brief on Petition for Certiorari in *Paul H. Aschkav & Co. v. Kamen,* 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 (1968), has at least a surface persuasiveness:

> Many, probably a majority, of the frauds practiced by securities firms involve misconduct by employees—typically by sales representatives who make false or unfounded representations with respect to securities. It is the Commission's experience that from time to time salesmen actually whet the appetites of gullible public customers by representing that they are breaking their employers' rules by giving them a special deal; for example, by giving them more than the prescribed quota of a new issue of securities. But, whatever the representations made by the salesmen or other employees of the

broker-dealer, we have found that investors customarily rely primarily on the integrity, reputation, and responsibility *of the firm itself* rather than on the character of the particular employee with whom they happen to be dealing.

Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 Univ.Pa.L.Rev. 597, 607 (1972) (hereinafter as "Ruder"), quoting SEC amicus brief, *supra,* at 23.

The Court recognizes that the major problem with the argument against a congressional intent to include broker-dealers as controlling persons is the language of the controlling person provisions themselves. Section 15 applies to *"[e]very* person who, by or through stock ownership, *agency* or otherwise ... controls *any* person liable under section 11 or 12...." 15 U.S.C. § 77 *o* (emphasis added). Section 20(a) applies to *"[e]very* person who, *directly* or indirectly, controls *any* person liable under any provision of this chapter or of any rule or regulation thereunder...." 15 U.S.C. § 78t(a) (emphasis added). Although the Court believes that a good argument could be mounted for public policy considerations against the application of the controlling person provisions to broker-dealers, the language of the statutes impels to the contrary. *See generally* 1974 Duke L.J., *supra,* at 838; 19 Vill.L.Rev., *supra,* at 627.

■ Since the Court has interpreted *Carpenter* as holding that the controlling person provisions are the sole standard of liability of broker-dealers for the acts of their employees, it is appropriate for the Court to briefly address the concern expressed by Judge Kaufman and others that such a conclusion will result in "a hear-no-evil, see-no-evil approach by partners of a brokerage house." *Johns Hopkins University v. Hutton, supra,* 297 F.Supp. at 1212. The Court hopes and believes that this concern is not well-founded. The concern of a hear-no-evil, see-no-evil approach obtains, the Court believes, as a result at a failure to appreci-

ate the utility of the good faith defense in § 20(a) and § 15. The defense should be applied on a sliding scale so that what may be good faith in one case may not necessary constitute good faith in another. As one commentator has suggested:

the exculpating standard should be applied with varying degrees of stringency according to the circumstances of the individual case, so as best to accommodate the conflicting interests of the investing public and the business community.

Note, *The Burden of Control: Derivative Liability Under Section 20(a) of the Securities Exchange Act of 1934*, 48 N.Y.Univ.L. Rev. 1019, 1036 (1973) (hereinafter as "48 N.Y.Univ.L.Rev.").

■ For example, the courts are in general agreement that a more stringent supervisory duty should be imposed upon a broker-dealer than upon an officer or director of a brokerage firm. *See, e. g., Kravitz v. Pressman, Frohlich & Frost, Inc., supra,* at 213; *Rochez Bros., Inc. v. Rhoades, supra,* at 886; *SEC v. Lum's, Inc., supra* at 1064; *Hecht v. Harris, Upham & Co., supra,* 283 F.Supp. at 438; *Lorenz v. Watson,* 258 F.Supp. 724, 732–33 (E.D.Pa. 1966). *See* 48 N.Y.Univ.L.Rev., *supra,* at 1036–39. Thus, in practice it will be more difficult for a broker-dealer to exculpate himself using the good faith defense than for an officer or director. This would seem to be entirely appropriate since the broker-dealer is usually in a better position to prevent the violation of the securities laws. Of course, the courts will also want to take other circumstances into account, such as the egregiousness of the violation, its duration, the agent's experience with the company, evidence of lax applications of safeguards and the like. *See generally* 48 N.Y. Univ.L.Rev., *supra,* at 1034–41. Admittedly, an investor does not have the same access to the deep pockets of the broker-dealer under § 20(a) and § 15 as he would have had under common law agency principles. Nevertheless, "[i]t is ... difficult to imagine how a brokerage firm could reasonably argue that an ostrich-head-in-the-sand approach satisfies the requirement of good

faith under section 20(a)...." 48 N.Y. Univ.L.Rev., *supra,* at 1038.

■ On the basis of the foregoing analysis, the Court rules that Anderson & Strudwick's motions to dismiss should be GRANTED insofar as plaintiffs' Complaint may state claims for relief against the brokerage firm under the common law doctrine of *respondeat superior.* However, the Court finds that plaintiffs have sufficiently alleged claims for relief against Anderson & Strudwick under § 20(a) of the 1934 Act. Plaintiffs have alleged that Blanton violated § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder and that

[a]t all times pertinent to the allegations herein, defendant Blanton was in the employ of and under the control of Anderson & Strudwick as a sales representative and was engaged in effecting sales of securities.

Haynes, Jr., Complaint, ¶ 6; Haynes, Sr., Complaint, ¶ 6. This is all that is required to state a claim under § 20(a). *See SEC v. First Securities Co.,* 463 F.2d 981, 987 (7th Cir.), *cert. denied sub nom. Mcky v. Hochfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); *Lorenz v. Watson, supra,* at 732–33. The burden of asserting and proving the defense of good faith is on Anderson & Strudwick. *SEC v. First Securities Co., supra,* at 987; *Kravitz v. Pressman, Frohlich & Frost, Inc., supra,* at 212; *Gordon v. Burr, supra,* at 168 & 168 n. 11; *Hecht v. Harris, Upham & Co., supra,* at 438–39; *Lorenz v. Watson, supra,* at 732; *Ruder, supra,* at 602.

■ Anderson & Strudwick contends that the allegations are insufficient under § 20(a) because plaintiffs have failed to allege "culpable behavior" on the part of the brokerage firm. Anderson & Strudwick finds support for this contention in *Carpenter,* where Judge Hoffman said:

The controlling persons provision [of both the 1933 and 1934 Acts] contain a state-of-mind condition that requires a showing of something more than negligence to establish liability. [*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 (1976)] at nn. 27–28, 96 S.Ct. 1375, 1388, at nn. 27–28, 47 L.Ed.2d 668.

*Carpenter, supra,* at 394. But Judge Hoffman contravened this view when he said:

> In order to satisfy the requirement of good faith *it is necessary for the controlling person to show* that some precautionary measures were taken to prevent an injury caused by an employee. *Securities & Exchange Commission v. First Securities Company of Chicago,* 463 F.2d 981, 987 (7th Cir. 1972); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1210 (9th Cir. 1970). *See also, Zweig v. Hearst Corporation,* 521 F.2d 1129, 1134–35 (9th Cir. 1975).

*Id.* (emphasis added). The first sentence quoted indicates that the burden is on plaintiffs to allege and prove culpability on the part of Anderson & Strudwick. The latter indicates that it is the broker-dealer who has the burden of asserting the defense and going forward with the evidence on the issue of good faith. Obviously the burden rests with one party or the other, not with both.

As recited above, other courts have uniformly held that the burden of proof as to the good faith defense is on the controlling person. Were it otherwise, good faith would not be a defense; its absence would be an element of a § 20(a) cause of action. Since it is not an element of § 20(a), Anderson and Strudwick's argument is untenable. This conclusion is supported by the case law. In *Lorenz v. Watson, supra,* one of the leading cases on § 20(a) liability, "the defendants point[ed] to the absence in the complaint of any allegation that the defendants induced the activity complained of . . . ." *Id.* at 732. The court rejected this contention, holding that it was "for the defendants to prove that they acted in good faith." *Id. See SEC v. First Securities Co., supra,* at 987 (holding that "the district judge gravely misapprehended the operation of section 20(a)" in rejecting the claim on the ground that *plaintiffs* had not produced sufficient evidence of controlling person's "bad faith"). *See generally* 1974 Duke L.J., *supra,* at 839–43.

That the Fourth Circuit recognized the established law in this area is evidenced by the second quoted statement from Judge Hoffman's opinion in *Carpenter.* The first

sentence was a mere inadvertence in expression. To hold otherwise would be to require plaintiffs to allege and prove scienter, or "culpable behavior," as to the controlling person under § 20(a), as well as to the employee under § 10(b) and Rule 10b–5. Section 20(a) would thus be reduced to surplusage. In short, plaintiffs might as well sue the controlling person directly under the anti-fraud provisions as under § 20(a). Congress certainly intended there to be a difference between § 10(b) and § 20(a). The difference is the placement of the burden of proof as to the defendant's state-of-mind. *See* 1974 Duke L.J., *supra,* at 842 n. 108.

Accordingly, insofar as plaintiffs' Complaint states claims against Anderson & Strudwick under § 20(a), the brokerage firm's motions to dismiss are DENIED.

### III.

Since Anderson & Strudwick's liability, if any, can only be secondary under § 20(a), the brokerage firm further contends that this action must be dismissed unless plaintiffs have stated a claim against Blanton for which relief can be granted. Thus, Anderson & Strudwick, as well as Blanton himself, has set forth several grounds upon which this action should be dismissed as to Blanton and hence as to Anderson & Strudwick. The Court will consider each ground seriatim.

#### a. Scienter

Defendants' first ground for dismissal is that plaintiffs' Complaint does not contain allegations of scienter with respect to the conduct of Blanton. The law is well-settled that scienter is a necessary element of a private cause of action under § 10(b) and Rule 10b–5. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 183–214, 96 S.Ct. 1375, 1380–1391, 47 L.Ed.2d 668 (1976). In *Hochfelder,* Mr. Justice Powell defined scienter as the "intent to deceive, manipulate or defraud." *Id.* at 193, 96 S.Ct. at 1380. Plaintiffs' Complaint does not contain express allegations that Blanton knowingly made misrepresentations to plaintiffs with the "intent to deceive, manipulate or defraud." Instead, plaintiffs' Complaint tracks the language of § 10(b) and Rule

**1316**

10b–5. Haynes, Jr., Complaint, ¶ 8; Haynes, Sr., Complaint, ¶ 8. Plaintiffs also allege that they have suffered damages "[a]s a direct and proximate result of the misrepresentations, omission, fraud, deceit, and other unlawful conduct of the defendants...." Haynes, Jr., Complaint, ¶ 23; Haynes, Sr., Complaint, ¶ 22. Finally, plaintiffs allege that they were unaware that Blanton's representations concerning C.H.B. were untrue. Haynes, Jr., Complaint, ¶¶ 12 and 19; Haynes, Sr., Complaint, ¶¶ 16 and 20.

 The Court notes initially that plaintiffs' allegations that they were unaware that Blanton's representations were false does nothing towards satisfying the requirement of scienter. The Court is concerned only with plaintiffs' allegations with respect to Blanton's state of mind. The issue, then, is whether the mere tracking of the language of § 10(b) and Rule 10b–5 is a sufficient allegation of scienter. This issue must be resolved, bearing in mind the liberal pleading requirements of Fed.R.Civ.P. 9(b), which provides in pertinent part that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

The Court has found three cases considering the same or a similar issue. In *SEC v. GSC Enterprises*, 469 F.Supp. 907, 910–11 (N.D.Ill.1976) (claiming violations of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a)), and *SEC v. Joseph Schlitz Brewing Co.*, 452 F.Supp. 824, 831 (N.D.Ill.1978) (claiming violations of § 10(b) and Rule 10b–5), the courts concluded that pleading scienter in the language of the applicable section or rule was sufficient to satisfy the scienter requirement of *Hochfelder*. In *Wolford v. Equity Resources Corp.*, 424 F.Supp. 670, 671–72 (S.D.Ohio 1976) (claiming violations of § 10(b) and Rule 10b–5), the court reached the opposite conclusion, stating that "something more than a conclusory restatement of the statutory language is required to meet the *Hochfelder* scienter requirement." *Id.* at 672.

In a related case, *SEC v. Penn Central Co.*, 450 F.Supp. 908 (E.D.Pa.1978), the court noted that the complaint, as in this case, did not allege in "a single terse statement that defendants caused the misrepresentations to be made with an 'intent to deceive, manipulate or defraud....'" *Id.* at 917. In that case, however, the complaint alleged that defendants had engaged in a "scheme" and set forth the "incentive" for the scheme. The court concluded:

> This case thus resembles *SEC v. Wills*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,102 [472 F.Supp. 1250] (D.D.C.1977), in which the court deemed scattered references to omissions, deceptions, concealments and failures to disclose as sufficient, taken together, to constitute an allegation of scienter, and divurges with *Wolford v. Equity Resources Corp.*, 424 F.Supp. 670 (S.D.Ohio 1976), in which the mere tracking of the statutory language was deemed not to allege sufficiently scienter in a private damages suit.

*Id.* at 917 n. 7.

 Apparently the court in *Penn Central Co.* thought that "something more than a conclusory statement of the statutory language is required to meet the *Hochfelder* scienter requirement." *Wolford, supra*, at 672. This Court is in agreement. Plaintiffs have alleged several acts on the part of Blanton which apparently support their claims under § 10(b) and Rule 10b–5, without any reference to Blanton's state of mind. For example, plaintiffs have not alleged that the representations with respect to the imminent takeover of C.H.B. by General Foods were made by Blanton with the intent, or as part of a plan or scheme, to deceive, manipulate or defraud plaintiffs. Plaintiffs have not claimed that Blanton knew the alleged inside information to be false, nor have plaintiffs otherwise alleged intentional misconduct on the part of Blanton with respect to plaintiffs. *See generally, Carras v. Burns, supra*, at 256. From the Complaint, it may very well be that Blanton had the best, albeit illegal, intentions when passing on the information to plaintiffs regarding C.H.B.

The Court does not understand the law to require plaintiffs to plead facts from which a fraudulent intent can be inferred. *See* C.

Wright and A. Miller, *Federal Practice and Procedure* § 1301 (1969). The Court does not think it inappropriate, however, to require plaintiffs to make a general averment of scienter in connection with the conduct of Blanton of which plaintiffs complain. It is not necessary for this Court to decide which allegations, when taken separately or in combination, will satisfy the pleading requirement of scienter. The Court simply decides that merely tracking the statutory language of § 10(b) and Rule 10b–5, as in this case, is insufficient. Of course, the issue can be readily avoided by plaintiffs by alleging in "a single terse statement" that Blanton knowingly made misrepresentations to plaintiffs with the "intent to deceive, manipulate or defraud," for example. Accordingly, plaintiffs are GRANTED leave to file an amended complaint making sufficient allegations of scienter with respect to Blanton, if they are able to do so, within twenty days of the entry hereof; failure to do so shall result in a dismissal with prejudice as to plaintiffs' claims for relief under § 10(b) and Rule 10b–5.

### b. *In Pari Delicto*

■ Defendants' second ground for dismissal is that plaintiffs are barred by the doctrine of *in pari delicto* from asserting a claim against Blanton under § 10(b) and Rule 10b–5. There is a split of authority as to whether the defense of *in pari delicto* is applicable to suits by "tippee" plaintiffs against their "tippers." *Compare Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1156–64 (3d Cir. 1977); *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 703–05 (5th Cir. 1969); *In re Haven Industries, Inc.*, 462 F.Supp. 172, 177–180 (S.D.N.Y.1978) *with Nathanson v. Weis, Voison, Cannon, Inc.*, 325 F.Supp. 50, 52–58 (S.D.N.Y.1971). The Fourth Circuit's treatment of the *in pari delicto* defense in *Lawler v. Gilliam*, 569 F.2d 1283, 1291–94 (4th Cir. 1978), in the context of a claim under § 12(1) of the 1933 Act, 15 U.S.C. § 77*l*(1), is not favorable to the defense, though *Lawler* certainly does not foreclose the availability of the defense in federal securities cases. The test adopt-

ed by the Fourth Circuit in *Lawler* for determining the availability of the defense of *in pari delicto* does, however, call upon the trial court to make a determination of fact regarding the mutual fault of the parties. *See Lawler v. Gilliam, supra*, at 1292–93. The Court believes that such a determination on a motion to dismiss would be inappropriate. Accordingly, defendants' motions to dismiss the Complaints on the ground that plaintiffs are barred by the defense of *in pari delicto* are denied without prejudice to defendants' rights to refile their motions on this ground at an appropriate time in this case.

### c. *Standing*

■ Defendants also move the Court to dismiss plaintiffs' Complaints insofar as they contain allegations against Blanton that are not actionable under § 10(b) and Rule 10b–5. The first such allegation challenged by defendants is that plaintiffs were induced to *retain* shares of C.H.B. stock based upon Blanton's alleged misrepresentations. Defendants claim that plaintiffs have no standing to raise these claims in view of the holding in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip Stamps* the Supreme Court adopted the *Birnbaum* rule [8] which holds that only persons who are actual purchasers or sellers of security have standing to bring claims for damages under § 10(b) or Rule 10b–5. *Id.* at 731–749, 95 S.Ct. at 1923–1931. *Blue Chip Stamps* involved a fact situation in which Manor Drug Stores decided not to purchase stock on the basis of an allegedly misleading prospectus. The Supreme Court also stated that the *Birnbaum* rule barred a second class of potential plaintiffs—"actual shareholders in the issuer who alleged that they decided not to sell their shares because of an unduly rosey representation or a failure to disclose unfavorable material." *Id.* at 737–38.

Other courts considering similar claims where plaintiffs allegedly retained shares of stock in reliance upon misrepresentations,

8. *Birnbaum v. Newport Steel Corporation*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

have uniformly applied the *Blue Chip Stamps-Birnbaum* rule in barring those claims under § 10(b) and Rule 10b–5. *See, e.g., Marsh v. Armada Corp.,* 533 F.2d 978, 981–82 (6th Cir. 1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977); *Herm v. Stafford,* 461 F.Supp. 502, 505 (W.D.Ky.1978); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 545 (S.D.N.Y.1977); *Gaudin v. K.D.I. Corp.,* 417 F.Supp. 620, 626–27 (S.D.Ohio 1976), *aff'd,* 576 F.2d 708, 711 (6th Cir. 1978). The Court believes that these cases set forth the applicable law and should be followed here. Accordingly, plaintiffs' Complaint is DISMISSED for lack of standing insofar as they allege that plaintiffs are entitled to damages as a result of their retention of C.H.B. stock in reliance upon representations made by Blanton.

■ Defendants next challenge plaintiffs' allegations that Blanton refused to sell their shares of C.H.B. stock upon direction. It is clear that any damages plaintiffs may have suffered in this regard did not occur "in connection with the purchase or sale of any security" in the *Blue Chip Stamps* sense of that phrase. The observation of the court in *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442 (2d Cir. 1971), in which plaintiffs claimed that defendant failed to sell their stock upon direction, is relevant here:

> plaintiffs' claim is nothing more than a garden-variety customer's suit against a broker for breach of contract, which cannot be bootstrapped into an alleged violation of § 10(b) of the Exchange Act, or Rule 10b–5 in the absence of allegation of facts amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud.

*Id.* at 445.

The Court believes that plaintiffs lack standing under § 10(b) and Rule 10b–5 to raise the claim that Blanton refused to sell their stock as directed. Accordingly, defendants' motion to dismiss plaintiffs' complaints as to this allegation is GRANTED.[9]

■ Finally, defendants contend that plaintiffs lack standing under the antifraud provisions to make the claim that Blanton purchased shares of C.H.B. stock on plaintiffs' behalf without their authorization. The glaring deficiency in plaintiffs' Complaint is that plaintiffs have not alleged that Blanton acted with an "intent to deceive, manipulate or defraud" when he allegedly made the unauthorized purchases of C.H.B. stock. The fact that the purchases were unauthorized, assuming that to be true, does not establish a claim for which relief can be granted under § 10(b) or Rule 10b–5. At best plaintiffs have stated a claim sounding in tort or contract, for which this Court has no independent basis for jurisdiction. *See Wassel v. A. G. Edwards & Sons, Inc.,* 425 F.Supp. 1205, 1206–07 (D.Md.1977).

■ The Court has heretofore granted plaintiffs leave to amend the § 10(b) and Rule 10b–5 counts of their Complaint with respect to the element of scienter. It is possible, though extremely doubtful, that plaintiffs could make an allegation of scienter with respect to Blanton's alleged unauthorized purchases of C.H.B. stock. Accordingly, plaintiffs are GRANTED leave to amend this count to state a claim under § 10(b) and Rule 10b–5 within twenty days from the entry hereof. Failure to do so shall result in a dismissal with prejudice with respect to this count.

## IV.

The next consideration is Anderson and Strudwick's motion to dismiss plaintiffs' claim for relief under Rule 10b–16 for lack of standing.[10] Clearly Rule 10b–16 does not

---

9. The Court notes, however, that Haynes, Sr., has raised the same claim in Count Three of his complaint as a state claim actionable under this Court's pendent jurisdiction. The pendent state claims alleged in Counts Two and Three of Haynes, Sr.'s complaint are considered below in Part V.

10. Rule 10b–16 reads in pertinent part as follows:

> (a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or deal-

provide an express cause of action for non-compliance with the Rule. Therefore, plaintiffs have standing under Rule 10b–16 only if there exists an implied private cause of action.

The Court has found only three cases even remotely related to the issue of whether there is an implied private cause of action for noncompliance with Rule 10b–16. In *Stephens v. Reynolds Securities, Inc.*, 413 F.2d 50 (N.D.Ala.1976), the court simply found that defendant had complied with the disclosure requirements of the Rule and therefore ruled that defendant was entitled to summary judgment. *Id.* at 51–52. The court did not address the issue at hand. In *Establishment Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1361 (S.D.N.Y.1978), the court dismissed plaintiff's claim under Rule 10b–16, stating that plaintiff had not cited and the court was unaware of a case establishing any private right of action for damages under Rule 10b–16. In *Liang v. Dean Witter & Co., Inc.*, 540 F.2d 1107 (D.C.Cir.1976), the District of Columbia Circuit permitted a private cause of action for alleged noncompliance with Rule 10b–16. Judge Wilkey stated by way of a footnote:

> It may safely be assumed that noncompliance with Rule 10b–16 provides the basis for a private cause of action. It is already established that violation of Rule 10b–5, a rule of nondisclosure analogous to Rule 10b–16, implies a civil remedy. *Supt. of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). Our recognition here accords with the view that "private enforcement of Commission rules may '[provide] a necessary supplement to Commission action.'" *Blue Chip Stamps*

*v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975), *quoting J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).

While the issue of whether a private claim exists under Rule 10b–16 was thus addressed in passing in *Liang*, the issue is squarely before this Court and must be met head on.

The appropriate starting place is *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort* the Supreme Court listed four factors to be considered in determining whether to imply a private right of action:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?... Third, is it consistent with the underlying purposes of the legislative scheme to apply such a remedy for the plaintiff?... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2087 (citations omitted). In recent cases, the Supreme Court has refined the *Cort* test, indicating that "what must ultimately be determined is whether Congress intended to create the private remedy asserted...." *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d

---

er establishes procedures to assure that each customer

(1) Is given or sent at the time of opening the account, a written statement or statements disclosing (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that will be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debt balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extended credit, if any, will be made, and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required....

17 C.F.R. § 240.10b–16.

**1320**

82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). With the intent of Congress as its lodestar, the Court will attempt to discern whether a private cause of action is implied in Rule 10b–16.

The history surrounding the promulgation of Rule 10b–16, as set out in detail by Judge Wilkey in *Liang*, is relevant here:

When Congress passed the Truth in Lending Act in 1968,[11] it expressly exempted securities accounts from its coverage.[12] The Senate Report noted:

The Committee has been informed by the Securities and Exchange Commission that the Commission has adequate regulatory authority under the Securities Exchange Act of 1934 to require adequate disclosure of the costs of such credit. The Committee has also been informed in a letter from the SEC that "the Commission is prepared to adopt its own rules to whatever extent may be necessary."

In recommending an exemption for stockbroker margin loans in the bill, the Committee intends for the SEC to require substantially similar disclosure by regulation as soon as it is possible to issue such regulation.[13]

The House Report agreed.[14]

Rule 10b–16 represents the SEC implementation of the instruction from Congress. It was adopted on 1 December 1969,[15] after notice and comments, and became effective 1 April 1970. The SEC authority for the Rule is derived, of course, from the prohibition in Section 10(b)[16] of the Securities Exchange Act of 1934 against the use of "any manipulative or deceptive device" in connection with the purchase or sale of security. Tracking the express purpose of the Truth in Lending Act,[17] the SEC announced the disclosure sought by Rule 10b–16 as follows:

The initial disclosure is designed to insure that the investor, before his account is opened, understands the terms and conditions under which credit charges will be made. This will en-

able him to compare the various credit terms available to him and to understand the methods used in computing the actual credit charges.[18]

[11] Pub.L.No.90–321, 82 Stat. 146, 15 U.S.C. §§ 1601 et seq.

[12] 15 U.S.C. § 1603(2).

[13] S.Rep.No.392, 90th Cong., 1st Sess. 9 (1967).

[14] H.Rep.No.1040, 90th Cong., 1st Sess. (1967), 1968 U.S.Code Cong. & Adm.News 1962, 1986.

[15] Securities Exchange Act Release No. 8733, 34 F.R. 19717.

[16] 15 U.S.C. § 78j(b).

[17] *See* 15 U.S.C. § 1601.

[18] Securities and Exchange Act Release No. 8733, 34 F.R. 19717.

*Liang, supra,* at 1110–1111.

Since Rule 10b–16 was promulgated as the analogue of the Truth in Lending Act in the area of federal securities law, the Court should be guided by whether Congress created a private right of action under the Truth in Lending Act in determining whether a private right of action should be implied under Rule 10b–16. An examination of the Truth in Lending Act reveals that Congress created an express cause of action for customers where there had been a noncompliance with the requirements of the Act. *See* 15 U.S.C. § 1640(a). That Congress created an express remedy under the Truth in Lending Act weighs heavily in favor of an implied cause of action for noncompliance with Rule 10b–16. Indeed, the denial of a remedy under the Rule would be inconsistent with the express intent of Congress that customers have a remedy for noncompliance with an analogous statute. Since the purpose of the Truth in Lending Act and Rule 10b–16 is the same, that is, customers should be informed about the terms and conditions of the extension of credit, the Act and the Rule should be read in harmony, if at all possible.

In addition, it is significant that Rule 10b–16 was promulgated under § 10(b) of the 1934 Act. It is well-settled that a private right of action exists under § 10(b) for violations of Rule 10b–5. Thus, it would be inconsistent to permit a private right of action for violations of one rule

promulgated under § 10(b), but not under another rule promulgated under the same section. *See Liang, supra,* at 1113 n. 25. Moreover, "it must be remembered that Rule 10b–16, like the Truth in Lending Act, is a rule of disclosure for the benefit of the customers; it is not a rule for the financial safety of the brokerage firms." *Liang, supra,* at 1112–13. Hence, the Court is satisfied that plaintiffs, who were customers of Anderson & Strudwick, are members of the class for whose *"especial* benefit" Rule 10b–16 was promulgated. *Cort v. Ash, supra,* at 78, 95 S.Ct. at 2087.[11] Having taken these considerations into account, the Court reaches the conclusion that an implied private cause of action for damages exists under Rule 10b–16 for noncompliance with the rule. Accordingly, Anderson & Strudwick's motion to dismiss as to this claim is DENIED.

■ This does not end the Court's inquiry, however. The Court must also determine whether scienter is a necessary element of a claim under Rule 10b–16. That scienter is a necessary element of a claim under § 10(b) and Rule 10b–5, as pointed out above, tends to support the conclusion that scienter should be an element of a claim under Rule 10b–16. Scienter is not, however, an element of a claim under the Truth in Lending Act. *See* 15 U.S.C. § 1640.[12] The Court is thus hard-pressed to require plaintiffs to allege and prove scienter under the Act's counterpart in the field of federal securities law. If Congress' purpose in enacting the Truth in Lending Act and in having Rule 10b–16 promulgated was to have informed customers, it must be recognized that a customer would be just as uninformed if the noncompliance with the

Act or the Rule were unintentional as if it were intentional.

■ Also, the requirement of scienter would be foreign to the plain language of Rule 10b–16. The Rule is mechanical in nature, simply requiring a broker-dealer to establish procedures to assure that each customer is informed of the information enumerated in the Rule. Though the question is troublesome the Court believes that Rule 10b–16 should be read consistently with the Truth in Lending Act. The Court recognizes that this decision is inconsistent with the requirements of a claim under § 10(b) and Rule 10b–5. Nevertheless, it comports more nearly to the express intent of Congress as evidenced by the Truth in Lending Act. Accordingly, the Court rules that scienter is not a necessary element of a cause of action under Rule 10b–16.

## V.

Haynes, Sr., has asserted two pendent State claims against defendants, one sounding in tort and the other in contract. Count Two of Haynes, Sr.'s, Complaint charges defendants with conversion of certain shares of Sierracin Corporation stock. Count Three of the Complaint alleges that Haynes, Sr., directed defendants to sell his shares of C.H.B., but that defendants refused to obey the sell order in breach of contract.

■ Anderson & Strudwick moves the Court to dismiss these claims on the ground that the Court lacks pendent jurisdiction under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Since plaintiffs have been granted leave to amend their complaints with respect to their claims under § 10(b) and Rule

11. The Court also notes that there is no indication that a cause of action under Rule 10b–16 would be "one traditionally relegated to state law, in an area basically the concern of the states...." *Cort v. Ash, supra,* at 78, 95 S.Ct. at 2087.

12. The Truth in Lending Act does provide that a bona fide unintentional error is a defense from civil liability. 15 U.S.C. § 1640(c). However, the defense of bona fide error has uniformly been interpreted to apply to clerical

errors only; it does not apply to mistakes of law. *See, e.g., Powers v. Sims & Levin Realtors,* 396 F.Supp. 12, 20 n.7 (E.D.Va.1975), *modified on other grounds,* 542 F.2d 1216 (4th Cir. 1976); *Doggett v. Ritter Finance Co.,* 384 F.Supp. 150, 157 (W.D.Va.1974), *modified on other grounds,* 528 F.2d 860 (4th Cir. 1975). It is evident from the case law that a negligent noncompliance with the Truth in Lending Act is actionable. Failure to comply with the act does not have to be knowing or intentional.

**1322**

10b–5, the Court believes it would be inappropriate to rule on these pendant claims at this time. Accordingly, Anderson & Strudwick's motion to dismiss for lack of pendant jurisdiction is DENIED without prejudice to its right to renew its motion following the filing of plaintiffs' amended complaint, if the brokerage firm deems it appropriate.

VI.

The Court now turns to Haynes, Jr.'s, motion to dismiss Blanton's counterclaim. Blanton's compulsory counterclaim, filed pursuant to Fed.R.Civ.P. 13(a), charges Haynes, Jr., with defamation in regard to communications to the SEC and various broker-dealers, as well as to associates, customers and acquaintances of Blanton, "that Blanton was a 'crook and a thief,' and that Blanton was guilty of 'criminal violations and would be sent to jail. . . .' " Counterclaim, ¶ 4. Haynes, Jr., contends that the counterclaim is barred by the statute of limitations, Va.Code § 8.01–248 (Repl.Vol. 1977), and therefore should be dismissed.

Haynes, Jr.'s, motion to dismiss must be DENIED at this juncture because the counterclaim does not set forth any dates from which it could be concluded that the claim is time-barred. *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 1277 (1969). However, Blanton is DIRECTED to amend his counterclaim to set forth the dates of the alleged defamations. Upon the filing of the amended counterclaim, Haynes, Jr., may within 10 days file an appropriate motion if he so desires.

And it is so ORDERED.